and Mr. Sheets, a note that you represented your client under the Criminal Justice Act and the court wishes to thank you for accepting that appointment. Mr. Sutton. May it please the court and fellow members and my case is about Jorge Castro, of course, and I want the court to know that I relied in my argument and as I talked to you today, I relied on the Katikos v. United States, Pettenberger v. Sam, our same at 380 U.S. 750 and 66 Supreme Court 1239 90 Lawyers Edition 1557 1946 case and it's because I think that case expresses the logic that I'm going to hope will convince you that Mr. Castro deserves to have his case overturned. Is that case in your brief? Judge, I think that my client sent that to the court. I was not able to verify that and I would ask that I be allowed to if it's not in there that I'd be allowed to. Well, it's not listed in your list of authorities. What? It's not listed in the authorities. That's what I was concerned about and I believe he may have it. I'm not sure. Well, please provide us with a 28-J. Okay. Judge, my issue, of course, one is the ineffective assistance of counsel. I'd also received day before yesterday a transcript showing that, in fact, Ms. Laverty did file a motion for a directed verdict at the end of the government's, I'm sorry, at the end of her presentation. In other words, the government got done. They asked if she was going to proceed with the defense and she made an oral motion to the court and I received a copy of it. I don't think that cures my claim of ineffective assistance of counsel, but I wanted to make sure the court was aware of that. Counsel, doesn't that just prove the point that the record's insufficient on direct appeal? I mean, it's not clear to me what the record is here. I mean, the suggestion is made that there were no objections to hearsay. The government cites at least 20 instances of hearsay objections. There's no record that I know on the motion for counsel to withdraw below. At least I'm not aware of anything before the court. That's one of the elements of your ineffective assistance claim. This issue of counsel didn't explain the hearsay rules, I don't think there's any record on that. Doesn't that, isn't that just kind of prove, isn't this kind of the test case or the ideal case for why we don't address ineffective assistance on direct appeal? Judge, I really studied that issue and one of the things that I looked at was the fact we have a motion to withdraw twice and the court, rather than even discussing it or making a record like you say, it's that divisiveness of Laverty's representation and it's that fact that you've got a defendant who is fighting not only the prosecution and his life is affected for up to 20 years, but you've also got a lawyer who he's fighting with and who he's not cooperating with and he's not an English-speaking person. And I believe that the record really comes from the record that I have and like you say, it's minimal because the judge doesn't explain his ruling, the judge doesn't talk about it, the judge doesn't let Mrs. Laverty talk about it, just simply demise. Doesn't the 2255 give you the opportunity to develop more than a minimal record? It does, Your Honor. It does. I know my law clerk called this my attention. Mrs. Laverty died last November, didn't she? She did, yes. I was sorry to read, I mean, any death. I actually... It was very easy for her former client to make all sorts of allegations. Well, and that I understand, but all of these are apparent from the record that is made, especially when you look at the interrogation by Ms. Laverty and her failure to introduce such factors as his, my client's, alleged participation could not have lasted more than one and a half years. And this was conspiracy that was based on six and seven years of conspiracy theories. But you agree, right, that if you join a conspiracy late in the conspiracy and the government proves the elements, you're on the hook for the entire conspiracy. That, and that's the law, and I agree with that. I think that more, I'm going to move to my second argument, because I think that my second argument is that they brought in, I believe, nine people. They wanted to tie them together as a single conspiracy. The reality is that these people not only didn't know each other or associate, but there were within the conspiracy, according to the record, there was at least four, quote, conspiracies occurring. And when you take this type of case before a jury and you set these nine people out there, and the only people that testify are people that are within one of the conspiracies and deals with three others, and then you've got another guy that is part of a conspiracy and he testifies just about my client to his benefit. And then as you go through the names, you, the separation is very evident from this record that the conspiracies were separate. In one, in one case, one of the conspiracies, Castro actually attempted to join and he was rejected. And that's out of the mouth of Medina, who testified. So how can you have a conspiracy of commonality when you have conspiracies that are, are people kicking the other person saying, I don't want you around and I don't want you in my group. In the Medina group, clearly these were identified groups. Medina, Suresos, Carranza, excuse me, Arrapes. But those were the things that were of concern to me. And I, and I think that there's so many, there were so many issues about that. There, the fact there were multiple, there was no corroboration to any testimony. It, and it was hearsay. And clearly the court can look at it and say, this, this is hearsay and this record indicates it's hearsay. And then if it's not corroborated, how do you rely on it? Because it's among, it's actually just a bunch of, of... Were the hearsay rulings of the district court appealed? They were not, Your Honor. That, and that's one of the things is there's, the record is very, very incomplete on any action being taken by Ms. Laverty for the protection of her client, which of course goes to the issue we talked about earlier. I was, you know, there, there was just no, there was no common leadership. There was no one person. There was no one group. And... Conspiracy law doesn't require that, does it? Yeah. How do you have conspiracy when you don't have people that deal with one another? You don't have any conversations. For heaven's sakes, in this case, my client, they, they not only didn't look at Castro, they didn't get a warrant for him. They didn't try to sell to him. They didn't surveil him. He was peripheral to this entire procedure. And when you go into court under these circumstances and you're trying to express your defense, in other words, your theory of defense is, look, I'm not part of this. But you never have the opportunity to do that because the judge has said, this is what I'm charging with, this is conspiracy, all of you together. And the individuality of that type of case, my ability to defend as an individual is crushed because suddenly all, everybody's there and nobody, if you look at the testimony of these various people that testified, they don't say there's a conspiracy. They say this guy sold to this guy and this guy sold to this guy. And that's really my, my major concern was in that. And I, and I looked at the distinctness of these conspiracies and I looked at the, what was going on. But I, there's no common evidence, there's no distinct evidence of a conspiracy. Well, counsel, isn't that commonly how conspiracies are proven? I mean, you, you're rarely going to find a contract of agreement between criminal conspirators. It's generally going to be evidence of circumstance and tacit agreement as opposed to express statements. That's right. And you would think that if there was some type of agreement, you wouldn't have one of the Medina group coming in and saying, we wouldn't let Castro in. You'd find that he'd say, oh yeah, he was one of the guys and he was. But isn't that just, I mean, the evidence indicated he played a specific role in the conspiracy, right? I mean, he, the government's not required to prove that he was the ringleader of the entire. Oh no. Or that he interacted individually with every co-conspirator. Got to show that he interacted in a, with a group of conspirators or with some other persons who were conspirators who may have even interacted with the others. But in this case, Arrapes and my client, neither one of them interacted with Medina because Medina's group was outside of them. That was Cicero and Badillo and Morales were in that group. And there was never an interaction. But if you just throw a group out there and you say, well, they were in the same geographical area and we've got evidence that they all had a dope connection, a cocaine connection, well, they must be working together. I think you have to at least show that there is something that intends that they are working together, that they are sharing some type of dope source. Because if you don't, then I can say that, well, those folks back there are in a conspiracy to listen. I mean, I don't know that. I don't, I can't rationalize that thinking that we use this mask. We mask, actually we mask the acts and we make them so that it gives that appearance, but we don't have to prove it. And I'm going to... During your rebuttal time, you can continue if you like, or... I'm going to save the rest of my time. Thank you, Mr. Sutton. Ms. Myers. May it please the court, counsel. My name is Amanda Myers and I'm an assistant United States attorney for the Southern District of Iowa, and I'm here today to represent the United States. I would first like to start my argument to address the sufficiency of the evidence. There was, looking at the record, in light most favorable to the verdict, a reasonable jury could have concluded that a conspiracy was reached in 2008 and 2009 between individuals that are called in the appellee's brief as the Medina Group, who are out of Wisconsin, to source large amounts of cocaine to the Quad City area and to the Muscatine area in the Southern District of Iowa. There was evidence presented at trial that the defendant, as of the summer of 2014, was obtaining amounts of cocaine base from an individual by the name of Vicente Jimenez. And it's interesting because the trial testimony shows that the cocaine Mr. Jimenez was receiving was packaged in a very distinct manner. Namely, it was shrink-wrapped and then wrapped in black electrical tape. There was testimony by an individual by the name of Sierra Hernandez, who indicated that he observed the defendant going to Mr. Jimenez, obtaining an amount of 9 ounces in the summer of 2014. So, just to be clear, the record shows that Castro Guerra knew the cocaine that he was receiving came from the Medina Group? Yes, Your Honor, and so the testimony was basically that Mr. Jimenez's quantities of cocaine were wrapped in a particular manner. They did a search warrant on an individual by the name of Mr. Miranda and discovered amounts of cocaine, approximately 4.7 kilograms, that was wrapped in this distinct manner. When the defendant then, in summer of 2014, he meets Mr. Arizpe, they come to an agreement that they're going to start pulling the resources together and obtaining amounts of cocaine. They meet with an individual by the name of Mr. Carranza, and that first meeting is because the defendant and Mr. Arizpe want to sell Carranza cocaine. However, as it turns out, Carranza is already obtaining large amounts, and he says, I get better prices, and so in turn what happens is the defendant and Arizpe begin acquiring amounts of cocaine from Carranza. So there is testimony that there's a specific discussion in reference to the source of the cocaine, and what happens is that Mr. Carranza brings out his cocaine and shows it to the defendant, and it's wrapped in this distinctive manner, shrink-wrapped with black electrical tape. And the defendant says, hey, my other source, Mr. Jimenez, cocaine is also wrapped in such a fashion. So certainly there is evidence at trial from which a jury could have concluded that the defendant did know the source of the common source of cocaine from his one source, Mr. Jimenez, and his second source, Mr. Carranza. And in fact, Mr. Carranza and Mr. Arizpe discuss a meeting, and the appellant discussed this meeting that occurred in summer of 2015, where Carranza basically wants to get out of the business, and Arizpe and the defendant are coming to him and wanting to purchase larger and larger quantities. So he says, you know, I don't want to be involved in this anymore. Let me just introduce you to them directly. At the conclusion of that meeting, that's not what's going to happen. Medina doesn't want to work directly with the defendant and Mr. Castro. And I think the appellant uses that fact to show that he couldn't have been involved in a conspiracy, right, because the Medina group, quote unquote, rejected him. And I would argue to this court that basically, pursuant to the Conway case that is cited in the appellee's brief, a single conspiracy may exist even if the participants and their activities change over time. And I think that is what was going on here. Certainly the Medina group is not saying you can never buy cocaine from one of our distributors, somebody that we're giving large amounts to, and then that you can't continue to buy from Mr. Carranza. Just simply that I don't know you, I don't trust you well enough, that I'm not going to be delivering to you directly. There was certainly no evidence that was introduced at trial that would have suggested that the Medina group said, nope, you can't buy any of our cocaine. The appellant argues that the government did not prove that the defendant was involved in this conspiracy during the entire time that was alleged in the indictment. But that is not what the government is required to prove at trial. Certainly just simply looking at the jury instructions that were provided to the jury is that the government must show that the defendant intentionally and voluntarily joined an agreement where cocaine would be distributed, and that he must join at some time, at some time while the agreement is in effect. And certainly the Holsher case that's also cited in the appellee's brief basically states that once you join a conspiracy, you assume full responsibility, even if you join at a later time. So certainly the case law indicates that the government doesn't have to prove that in 2009 he was active. He just has to, the government must show that at some time while the conspiracy was in place, he did join. And in this case, the first action or the testimony that the jury heard was that the first action of the defendant participating was the summer of 2014, and that it continued all the way through the summer of 2015. I think it's also, the appellee also argues issues as to seeking a instruction about withdrawal from the conspiracy. And the government would argue that that wouldn't necessarily have any impact on the jury verdict in this case. All of the testimony that was presented to the jury all revolved around the time frame where he was actually actively participating. So there really wasn't any testimony at trial where it was clear that the defendant had stopped participating, and then I don't feel that he was, number one, I don't feel that the evidence showed he was entitled to that instruction. There was testimony by Mr. Arispe and an individual by the name of Mr. Fullerton who was a customer of Arispe and the defendant in reference to a meeting in July, July 8th of 2016, which is beyond the scope of what was charged in the indictment, where they went to Mr. Fullerton, Arispe and the defendant wanting to re-engage in the distribution of cocaine together, wanting him to purchase amounts. So I think that certainly suggests that during the entire time frame he was an active participant. As far as the sufficiency of the evidence in regards to drug quantity, and that is an issue that is also raised by the appellee, the government would argue that there was more than sufficient evidence to show that the defendant was directly involved in the distribution of five kilograms or more of cocaine. And that would have via the testimony of Mr. Fullerton. Basically he stated that toward the end of 2014, all the way through the very end of July of 2015, he was purchasing large amounts from the defendant. The first two months he was purchasing approximately nine ounces at a time, and then after that time frame it was always approximately 18 ounces. He was going every week to every two that would have occurred at the very, very end of July, perhaps the very beginning of August of 2015. Certainly that testimony alone certainly shows that the conspiracy involved five kilograms or more. That doesn't even take into consideration the reasonable foreseeability of the other members of the conspiracy. And one of the individuals that was involved, he was in possession of 4.7 kilograms himself. One of the other individuals who testified, a Julio Sierra Hernandez. He was also obtaining amounts of cocaine from Jimenez, which was one of the sources of the defendant. He indicated he was receiving three to four kilograms per month from Mr. Jimenez. And so he assumed that Mr. Jimenez must himself have been getting at least five to six because he knew that Mr. Jimenez had other customers. So certainly I think it would be, if it was reasonably foreseeable to Mr. Hernandez, it certainly would have been reasonably foreseeable to Mr. Castro that this conspiracy involved five kilograms or more of cocaine, being that he was utilizing two separate individuals who were obtaining from the same source. As to the issue, the issues raised in the appellee's brief as to the ineffective assistance of counsel, I would just like to address those briefly. I would suggest that there are several issues that were raised by the appellant in the brief that really the record as noted is not really accurately developed at this time. There was a discussion on the record in reference to the motion in limine. The docket entry at 375 shows that there was a discussion by counsel. There's a name of a court reporter on the top of that docket entry. Those transcripts have not been provided or prepared for this court's review. In addition, as to the motions to withdraw, there was also hearings held on those and those docket entries are 356 and 365. And when you pull up those docket entries, it becomes clear that the government was sitting in at the very beginning of the hearing, was asked to leave, and there was a discussion held on the record in reference to those motions to withdraw. And there was also the name of a court reporter indicated on those docket entries. Those transcripts have not been ordered or provided to this court, so I don't feel that at this point it would be appropriate for that to be reviewed. Also, participation in jury selection and also pretrial contact, there's just simply nothing in the record here from which a decision can be made on those issues. There are certain issues that are raised that I do feel the record is sufficient at this time. One of those goes to the hearsay objections. And I think it's really important when you read the entire transcript, and some of those are noted in the appellee's brief, the trial counsel was making objections. So are you going into those in relation to ineffective assistance or as independent grounds of appeal for evidence? Just for the ineffective assistance of counsel argument. It was clear from my review that the defense counsel objected pretty much any time there was any hearsay potential that came in. Do you think the record's sufficient for us to make a ruling on the ineffective assistance on direct appeal? I do, Your Honor, and the reason why is because every time that the defense counsel did object to hearsay, there was always an appropriate ground to admit that hearsay. They were offered for against penal interest and also as statements of co-conspirators during the furtherance of a conspiracy. And I think that I where there was hearsay that actually came in that wasn't either considered non-hearsay or exception applied, where she did not object. As to... You say the record hasn't been fully developed, has it? No, that is correct. And I would just note, too, like specifically in reference to the jury selection issue, those parts of the transcripts have not been provided to the appellate court for review. So I think the whole record has not been developed, and that is clear. I think as far as the motion for judgment of acquittal, obviously there was one. A transcript has been provided. Another issue that was raised is that the defense attorney did not challenge the PSR. And in fact, when you look at docket number 419, she basically says, my client's innocent and doesn't admit to any of this stuff. And the only thing that she concedes is if you find that the defendant is responsible for 57 kilograms, then the base level of offense 34 is appropriate. But she's not conceding that he was responsible. She certainly makes clear in her objections that he's innocent, or she feels that he's innocent. And I think the other issue, there's a sufficiency of the evidence portion as far as his participation and the timeframe of that participation. But that's also raised in reference to ineffective assistance at counsel. And I think that that's something that based on this record can be decided by this court, because simply it's inconsequential. The government wasn't required to prove that, so there really can be no ineffective assistance at counsel for failing to argue that the government couldn't have possibly meant its burden because he was perhaps out of the area during a certain portion of the conspiracy. Looking at the record, in the light most favorable to the jury verdict, there is sufficient evidence to uphold the conviction in this case. And there certainly isn't anything in the record before the court that would show that counsel was ineffective, or that her performance was deficient in any way, and that any deficiency resulted in prejudice to the defendant. At this time, I have about one minute left. And if there are no questions, I would yield the remainder of my time. Thank you, Ms. Myers. Thank you. Mr. Sutton, you hear a rebuttal? Judges, my biggest concern is that when you talk about docket entries, and I went and I asked to sidebars or discussions that were held, I also want to note that I truly believe that when a defendant is being judged, there has to be some type of direction from the court that they need to be judged individually, and they need to be given the opportunity to be judged based on the common plan, design, or scheme. And I don't believe that any of that was shown by the proof in this case, and I think a fair reading of the record that I'm correct. I believe that also in the theory of the defense of this man, that when you have an attorney, and I don't know if she was sick at that time, I don't know if she was affected by it, but if there were objections on hearsay, that should be in the record that I receive, and I should have a fair opportunity to judge that actual record. And that would be developed on a ineffective assistance claim under 2255. Correct. I understand that, Your Honor. I think when Judge Kobus said that. The court would find out whether any substance to your defiant's objections or allegations or he is lying through his teeth. And that I don't know, Judge. We're not prejudging. No, no, you understand that. I believe that the court cannot find from this record a clear connection, and I actually think that counsel for the government is wrong when she talked about certain statements that were made. If they were made, they were not made in this record. They may have been made to the government privately. I don't know. But the record is clear that there wasn't the association with the Medina or with the one with the record. It's a reminder of what my our dear departed colleague, Sean R. Gibson, once said, the record will say what it says. Exactly, Your Honor. I agree. And thank you very much for your time and attention. I appreciate it. Thank you, Mr. Sutton. And the court also wishes to thank you for accepting.